Cite as 2024 Ark. App. 330

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-22-371

| | |
|---|---|
| DARRELL SMITH, JR., SUCCESSOR TRUSTEE OF THE SMITH FAMILY TRUST; AND COLE SMITH, EXECUTOR OF THE ESTATE OF DARRELL SMITH, SR., DECEASED<br><br>APPELLANTS/CROSS-APPELLEES<br><br>V.<br><br>TERRY ORSBUN AND CHRISTINE ORSBUN<br>APPELLEES/CROSS-APPELLANTS | **Opinion Delivered** May 22, 2024<br><br>APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT [NO. 17CV-21-92]<br><br>HONORABLE CANDICE A. SETTLE, JUDGE<br><br><br><br>AFFIRMED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL |

## RITA W. GRUBER, Judge

This interlocutory appeal arises out of a real-estate-transaction dispute concerning a house and approximately three acres located in Crawford County. Appellants are Darrell Smith, Jr., successor trustee of the Smith Family Trust (the Trust); and Cole Smith, executor of the estate of Darrell Smith, Sr., deceased (the Estate). Appellees are a married couple, Christine and Terry Orsbun. Appellants bring this appeal from (1) the February 18, 2022 rulings denying their motions for directed verdict; (2) the March 18, 2022 order and judgment and the April 19, 2022 amended order and judgment; (3) the May 16, 2022 order awarding attorney's fees and costs; and (4) the May 27, 2022 order of contempt.

Appellants state five points on appeal with multiple arguments in support of each. However, we address their points and arguments in three broad categories: contract

formation and enforcement, attorney's fees, and contempt. Appellants contend that the contract they were ordered to specifically perform was not properly formed and cannot be enforced—raising issues of merger, parol evidence, the statute of frauds, lack of a meeting of the minds, lack of consideration, standing, and impossibility of performance. Appellants also take issue with the attorney's fees and costs awarded to appellees as well as the contempt finding made against them and the accompanying daily penalty. On cross-appeal, appellees contend that the circuit court erred by not awarding them an equitable credit for the deprivation of the use of the at-issue property. We affirm.

## I. *Background*

On March 15, 2021, appellees filed suit against appellants and Darrell, Smith Jr., individually (Smith Jr.).[1] Appellees alleged that a contract existed between them, the Trust, and Darrell Smith, Sr. (Smith Sr.), for the sale of the at-issue property in exchange for $291,000. The at-issue property consists of a house and the one acre upon which it sits (the house property) and an adjacent and additional approximate two acres (the bluff property). Prior to Smith Sr.'s death, the house property was owned by the Trust, of which Smith Sr. was the sole trustee, and the bluff property was owned by Smith Sr. personally. Appellees further alleged that the contract was comprised of three documents: the residential "Real Estate Contract" (REC), the "Seller's Counter to the Real Estate Contract" (counter), and the "General Addendum" (GA) with the referenced survey portion attached. The REC, counter, and GA were attached to the complaint. Appellees claimed that the contract was breached on February 22, 2021, when appellants and Smith Jr. failed to close on the sale of

---

[1]Smith Jr. was dismissed as a party from the lawsuit on April 8, 2021.

the house property and the bluff property. Appellees requested that the circuit court order the specific performance of the contract and award additional damages caused by the delay of the closing as well as attorney's fees and costs.

On April 5, 2021, the Trust answered appellees' complaint, asserting that any contract that existed was between only it and appellees and was for the sale of the house property only in exchange for the $291,000. On April 19, the Estate answered appellees' complaint, denying that it was a party to the contract and further denying that the bluff property was subject to the contract that existed between appellees and only the Trust. On August 11, appellants filed a third-party complaint against Chuck Fawcett Reality, Inc. (Fawcett Realty); Linda Black, as an agent and employee of Fawcett Realty; and Tammy Best, as an agent and employee of Fawcett Realty (collectively the Fawcett parties).[2] On September 1, the Fawcett parties filed a counterclaim against appellants.

A bench trial was held on February 17 and 18, 2022. Appellees introduced twenty-three exhibits as well as the testimony of realtor Tammy Best (twice); professional land surveyor Ricky Hill; certified general real estate appraiser Angela Hartwig; real estate broker and owner of Chuck Fawcett Realty, Inc., Chuck Fawcett; BHC Insurance customer-service representative Jill Swad; roofer Tyler Reeves; Eddie Tunchez with ET Construction; Terry Orsbun; Smith Jr.; and real estate broker James Vitale. Appellants then moved for directed verdict multiple times, making the same arguments they do on appeal, and each motion was denied in turn. Appellants then put on their case-in-chief, introducing fourteen exhibits and the testimony of Tina Stephenson, closing department manager at Waco Title;

---

[2]The Fawcett parties are not parties to this appeal.

Tracy Wilhelm, a mortgage loan supervisor with Arvest Bank; James Vitale, real estate broker; Linda Black, a real estate agent with Chuck Fawcett Realty, Inc.; and Sandra Hiener, Crawford County tax assessor. Appellants renewed their motions for directed verdict, which were denied. The parties gave closing arguments, and the court requested proposed findings of fact and conclusions of law from the parties.

On March 9, 2022, the circuit court issued a letter to the parties setting out its rulings and directing appellees' counsel to prepare the order and judgment, including proposed findings of fact and conclusions of law that support the court's decision. On March 10, proposed findings of fact and conclusions of law were submitted by both appellants and appellees, to which appellants objected on March 16.

On March 18, 2022, the circuit court's order and judgment with findings of fact and conclusions of law was entered. The court concluded that a contract existed that was comprised of the REC, the counter, and the GA; that the contract satisfied the statute of frauds; and that the contract was for the sale of the house property and the bluff property in exchange for $291,000, which did not evidence a lack of consideration. The court found that there were two sellers—the Trust and Smith Sr.—and the contract was binding on appellees, the Trust, and Smith Sr. (now the Estate). The court did so having found that the counter delineated "Smith Family Trust / Darrel Smith" as the seller; that Smith Sr. was the trustee of the Trust; and that Smith Sr. signed the counter but did not designate any specific capacity in which he was signing.

The court further concluded that the death of Smith Sr. did not affect the material terms of the contract but rather the manner in which the contract had to be executed. The

4

court found that Smith Jr., as the successor trustee of the Trust, was authorized to act on behalf of the Trust if Smith Sr. was not able to do so; that prior to Smith Sr.'s passing, a valid power of attorney (POA) existed permitting Smith Jr. to transfer real estate on behalf of Smith Sr.; and that Smith Jr. signed the GA prior to Smith Sr.'s death, as evidenced by documents entered into evidence. The court also found unpersuasive appellants' argument regarding an unsatisfied condition precedent with respect to the appraisal value of the property and appellees' financing. The circuit court concluded that appellants had breached the contract by refusing to close the transaction. The court ordered appellants to specifically perform the contract by conveying the house property and the bluff property for the purchase price, less equitable credits for $22,929.61 in repairs to the house; $1416 in storage fees; $12,000 in rent; and $2400 in moving expenses. The order denied appellees' request for an equitable credit due to the deprivation of the use of the property. The court further ordered that closing occur not more than twenty-one days after the entry of the order and judgment.

On March 30, 2022, appellees filed a motion requesting $49,027.50 in attorney's fees and $1920 costs, a total of $50,947.50, to which appellants responded. On April 14, appellees filed a motion to show cause, setting out that despite the court's March 18, 2022 order to close the real estate transaction within twenty-one days of entry of that order—April 8— appellants refused to do so at the scheduled April 5 closing.

On April 15, 2022, appellants filed their first notice of appeal setting out that they were appealing the March 18, 2022 order and that the appeal was interlocutory and being

5

taken pursuant to Ark. R. App. P.–Civ. 2(a)(6).[3] That same day, appellees' counsel sent a letter to the court requesting a Rule 54(b) certification and submitting a new proposed order. On April 19, the order granting the motion to show cause was entered, ordering the Trust and the Estate to appear before the court on May 9 to show cause why each should not be held in contempt of court. Also on April 19, an amended order and judgment was also entered, which was substantively identical to the March 18, 2022 order and judgment except for the addition of the Rule 54(b) certificate. Appellants objected to the amended order on April 19.

On April 21, 2022, the Estate responded to appellees' motion to show cause, admitting its refusal to close but arguing that it had filed a notice of interlocutory appeal and had objected to the requirement that the closing occur within twenty-one days. It contended that the circuit court did not have the authority to remove Cole Smith as the executor of the Estate and that the order and judgment entered by the court was not a final, appealable order; thus, the circuit court could not enforce it pending resolution of the third-party claims involving the Fawcett parties. The Estate requested for the first time that the matter be stayed during the pendency of the appeal. That same day, the Trust responded to appellees' motion to show cause, contending that the court did not have the authority to

_____

[3]This subsection permits an interlocutory appeal regarding injunctive relief, and the order and judgment stated that appellees were "entitled to a mandatory injunction requiring [the Trust and the Estate] . . . to specifically perform the contract." Moreover, appellees characterized their request for specific performance as a "mandatory injunction." However, specific performance is its own kind of relief, separate and apart from injunctive relief. *See, e.g.*, *Hyde Vending Co. v. Wayne Poultry Co.*, 252 Ark. 355, 361, 479 S.W.2d 250, 255 (1972); *McDaniel v. Orner*, 91 Ark. 171, 173, 120 S.W. 829, 830 (1909). This distinction does not affect our analysis.

remove Smith Jr. as the trustee of the Trust; its other arguments were identical to those made by the Estate in its response.

On May 12, 2022, appellees filed an amended motion to show cause regarding appellants' refusal to close the real estate transaction per the court's order. On May 16, an order was entered awarding appellees $32,500 in attorney's fees and $520.50 in costs. On May 27, the order of contempt and for supersedeas bond was entered, the court having found appellants in contempt for failing to comply with its order to close or seeking a stay in a timely manner. That order mandated that appellants pay a daily fine of $250 for their contempt until a supersedeas bond was posted or a closing occurred. Appellants' request for stay was granted conditioned upon their posting a $50,000 supersedeas bond.

On August 3, 2022, appellants filed a motion to stay enforcement of judgment and remission of daily penalties with this court, requesting that we stay the order of contempt and thus stop the accrual of any further penalties. On August 5, appellees responded to that motion, contending that the motion was unnecessary given the plain language of the circuit court's contempt order and the posting of the bond. Appellees further responded that this court had no authority to forgive any of the already accrued penalties. On August 24, 2022, we granted appellants' request to stay the enforcement of the judgment and passed the request for remission of the daily penalties until the case is submitted.

## II.  *Direct Appeal*

We now address appellants' points and arguments in three broad categories: contract formation and enforcement, attorney's fees, and contempt. Where land is the subject of an agreement, a party to the agreement is entitled to specific performance. *Elder Constr. Co. v.*

7

*Ivey Lane, LLC*, 2010 Ark. App. 10, at 7, 370 S.W.3d 861, 865. Specific performance is an equitable remedy that compels performance of a contract on the precise terms agreed upon by the parties. *Id.* at 3, 370 S.W.3d at 864. Because specific performance is grounded in equity, circuit courts "have some latitude of discretion in granting or denying that relief, depending upon the inequities in a particular case." *Flippen v. Jones*, 2011 Ark. App. 191, at 6, 382 S.W.3d 695, 698. We review equity cases de novo on the record but will not reverse a finding by the circuit court unless it is clearly erroneous. *Elder Constr. Co.*, 2010 Ark. App. 10, at 4, 370 S.W.3d at 864. Whether specific performance should be awarded in a particular case is a question of fact for the circuit court. *Id.* On appeal, the question before us is whether the court's decision to grant specific performance was clearly erroneous. *Id.* In reviewing the circuit court's findings of fact, we give due deference to the circuit court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Id.*

In civil bench trials, the standard of review on appeal is whether the circuit court's findings were clearly erroneous or clearly against a preponderance of the evidence. *Peregrine Trading, LLC v. Rowe*, 2018 Ark. App. 176, at 1, 546 S.W.3d 518, 520. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a firm conviction that a mistake has been committed. *Id.* at 1–2, 546 S.W.3d at 520.

A.  Contract Formation and Enforcement

Appellants' first and second points on appeal take issue with the circuit court's oral rulings as well as the order and judgment determining that an enforceable contract existed

8

for the sale of the house property and the bluff property. Specifically, appellants contend that the circuit court erred in denying their motions for directed verdict and in entering judgment for appellees because no enforceable contract was formed. In support of that contention, appellants argue that (1) negotiations do not create a contract and are merged into the final document; (2) the terms were certain that there was no additional acreage, so parol evidence may not add to them; (3) there was no meeting of the minds; (4) the statute of frauds bars unsigned additions to the document; (5) impossibility of performance bars the claims; and (6) even if the parties later agreed to add realty, there was no additional consideration paid. Appellants' second point on appeal is that there was no contract because appellants lacked standing to sell the property.

In a civil bench trial, we treat a defendant's motion for "directed verdict" as a motion to dismiss. *Phillips v. Denton*, 2018 Ark. App. 90, at 5, 543 S.W.3d 508, 511; *see also* Ark. R. Civ. P. 50. In determining whether such a motion should have been granted, we review the evidence in the light most favorable to the nonmoving party, giving the evidence its highest probative value, taking into account all reasonable inferences deducible from it. *Woodall v. Chuck Dory Auto Sales, Inc.*, 347 Ark. 260, 264, 61 S.W.3d 835, 838 (2001). The motion should be granted only if there is no substantial evidence to support a verdict in the nonmoving party's favor. *Id.* When the evidence is such that fair-minded persons might reach different conclusions, then a factual question is presented, which requires reversal. *Id.* The standard is the same in a bench trial where the court acts as the fact-finder. *Peregrine Trading, LLC*, 2018 Ark. App. 176, at 15, 546 S.W.3d at 527.

On this record, there was certainly substantial evidence to move beyond the motion-to-dismiss stage. And ultimately, as discussed more fully below, each point appellants raise to attack the validity of the contract is meritless. As an initial issue, the cases cited by appellants merely set forth our standards regarding contract formation and enforcement and do not support their specific arguments. The essential elements of a contract are competent parties; subject matter; legal consideration; mutual agreement; and mutual obligation. *Terra Land Servs., Inc. v. McIntyre*, 2019 Ark. App. 118, at 12, 572 S.W.3d 424, 432. A court cannot make the parties' contract but instead can only construe and enforce the contract the parties have made. *Id.* There must be a meeting of the minds using objective indicators to have a valid contract. *Id.* Whether there is a meeting of the minds is a question of fact. *Id.* Whether a binding contract exists is a question of law. *Smith v. Prudential Prop. & Cas. Ins. Co.*, 340 Ark. 335, 336, 341, 343, 10 S.W.3d 846, 847, 850 (2000). The words in a document must be construed as written, using ordinary meanings. *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992).

The parol-evidence rule prohibits the introduction of extrinsic evidence that is offered to vary the terms of a written agreement; it is a substantive rule of the law, and its premise is that the written agreement itself is the best evidence of the intention of the parties. *Hurt-Hoover Invs., LLC v. Fulmer*, 2014 Ark. 461, at 11, 448 S.W.3d 696, 703. On the other hand, the parol-evidence rule does not prohibit the introduction of extrinsic evidence if it would aid the court in interpreting the meaning of particular language of a contract. *Id.* Nor does the parol-evidence rule prohibit the court's acquainting itself with the circumstances surrounding the making of the contract. *Id.* at 11–12, 448 S.W.3d at 703. On appeal, we

will not reverse the circuit court's ruling on the admission of evidence absent an abuse of discretion. *Id.* at 12, 448 S.W.3d at 703. Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Id.*

To be enforceable, a contract for the sale of land must comply with the statute of frauds, Arkansas Code Annotated section 4-59-101. *Boensch v. Cornett*, 267 Ark. 671, 673–74, 590 S.W.2d 55, 56–57 (1979). This requires the memorandum to be in writing, to be signed by the party to be charged or signed by some other person properly authorized by the person sought to be charged, and to contain all the essential terms. *Id.* A description of the land to be conveyed is an essential term. *Id.* While extrinsic evidence may not be used to add to or change a deficient description, it may be used to decipher or make intelligible the terms of the contract or clarify the description of the land. *Id.* The meaning of the description becomes plain and certain when the circumstances surrounding the negotiations and writing are disclosed. *See, e.g., Boensch, supra.*

The law of impossibility has evolved into a broader and more equitable rule of impracticability. *Smith v. Decatur Sch. Dist.*, 2011 Ark. App. 126, at 4–5. Impracticability of performance may excuse a party from performing contractual obligations. *Id.* The burden of proving impossibility of performance rests upon the party alleging it. *Id.* It must be shown that virtually every action within the person's power to perform the duty under the contract was taken and that the thing to be done cannot be effected by any means. *Id.* Resolution of the question requires an examination into the conduct of the party pleading the defense to determine the presence or absence of fault on his part in failing to perform. *Id.* Our supreme

court has drawn a distinction between objective impossibility, which amounts to saying "the thing cannot be done," and subjective impossibility, "I cannot do it." *Id.* It is only in cases of objective impossibility that performance is excused. *Id.*

The question of standing is a matter of law for this court to decide, and this court reviews questions of law de novo. *Grand Valley Ridge, LLC v. Metro. Nat'l Bank*, 2012 Ark. 121, at 9, 388 S.W.3d 24, 31. Whether an agent is acting within the scope of his actual or apparent authority is a question of fact for the fact-finder to determine. *Found. Telecomms., Inc. v. Moe Studio, Inc.*, 341 Ark. 231, 240, 16 S.W.3d 531, 537 (2000).

Against these many standards, we are not left with a firm conviction that the circuit court made a mistake or abused its discretion. First, the circuit court did not err in finding that the contract consisted of three written documents that when taken together formed a single agreement. Those three documents are the REC, the counter, and the GA with the referenced attached survey portion, each of which was admitted into evidence and is a completed Arkansas Realtors Association Form.

The REC contains a merger clause that states,

This [REC] . . . when executed by both Buyer and Seller, shall contain the entire understanding and agreement between Buyer and Seller with respect to all matters referred to herein and shall supersede all prior and contemporaneous agreements, representations, discussions and understandings, oral or written, with respect to such matters. This [REC] . . . shall not supersede any agency agreements entered into by Buyer or Seller and Listing Firm or Selling Firm.

A merger clause in a contract, which extinguishes all prior and contemporaneous negotiations, understandings, and verbal agreements, is simply an affirmation of the parol-evidence rule. *Altice USA, Inc. v. Johnson*, 2023 Ark. App. 120, at 11, 661 S.W.3d 707, 716. The REC also has a "counterparts" provision, which specifically states that the REC "may

be executed in multiple counterparts each of which shall be regarded as an original thereof but all of which together shall constitute one in the same."

Per the plain language of the counter: "all other terms as provided in the [i]nitial [REC] . . . are incorporated herein by reference and shall remain exactly as set forth therein, solely except those amended above." Regarding "counterparts," the counter states that "[t]his Seller's Counter Offer to the [REC] . . . may be executed in multiple counterparts each of which shall be regarded as an original hereof but all of which together shall constitute one in the same." The GA states that "upon its execution by both parties, [the GA] incorporates by reference all provisions of the above-referenced Contract/Agreement not expressly modified herein." The GA expressly permits the agreement to be executed in multiple counterparts, which taken together, will constitute the entire agreement.

Second, the entirety of the agreement reflects that the subject of the contract was the house property and the bluff property, and the parties to the contract were the Trust and Smith Sr. The REC, executed by appellees on December 24, 2020, reflects that appellees made an offer to purchase a "single family detached home with land" located at 805 N. 16th Street in Van Buren, Arkansas, for the sum of $274,000. The "full legal description" set forth in the REC is: "home and approximately 1.02 acres. PT NW SE NW S-T-R=19-9-31 parcel number = 700-08200-000. Complete legal to be determined by survey." Paragraph "11. Survey" states the following:

> Buyer has been given the opportunity to obtain a new certified survey. Should Buyer decline to obtain a survey as offered in Paragraph 11A of this Real Estate Contract, Buyer agrees to hold Seller, Listing Firm and Selling Firm involved in this Real Estate Contract harmless of any problems relative to any survey discrepancies that may exist or be discovered (or occur) after Closing.

Underneath that provision, the REC provides that "[a] new survey satisfactory to Buyer, certified to Buyer within thirty (30) days prior to Closing by a registered land surveyor, showing all improvements, easements and any encroachments will be provided and paid for by:", and a box next to the word "seller" is checked. The REC reflects that the seller was the Trust.

The two-page counter and the two-page GA were also created on December 24. The first page of the counter reflects a purchase price of $291,000, a closing date of February 22, 2020, and appellees as the buyer. It further reflects "Smith Family Trust" as the seller, and the property being sold as "805 N. 16th St., Van Buren, Arkansas 72956 Sebastian County." But the second page of the counter identifies the seller in print as "Smith Family Trust / Darrel Smith." On December 27, 2020, the counter was signed by Smith Sr., and there is no designation regarding what capacity, if any, Smith Sr. was executing the counter. It was also electronically signed by appellees that same day.

The first page of the GA reflects the property being conveyed as "805 N. 16th Street, Van Buren, Arkansas 72956 Crawford County." The GA reflects appellees as the buyer, and "Smith Family Trust Darrell Smith" as the sellers. The GA states that

> the undersigned Buyer/Lessee and Seller/Lessor in consideration for the covenants, agreements and promises made below and other good and valuable consideration, receipt and sufficiency being acknowledged, agree as follows:
>
> Attachment A–New Legal Property description.

The "Attachment A–New Legal Property description" language was filled into the GA form. Attached to the GA is a portion of the survey that contains a legal description reflecting that the new legal property description consists of a total 2.93 acres. The GA further states that

"upon its execution by both parties, [the GA] incorporates by reference all provisions of the above-referenced Contract/Agreement not expressly modified herein." The GA was drafted by Smith Sr.'s real estate representatives.

The circuit court found that the three documents, including the referenced attached survey portion, together make clear that the contract was for the sale of the house property and the bluff property. The REC reflects an offer to purchase a "home and approximately 1.02 acres," with a complete "legal to be determined by survey." The second page of the GA clearly incorporates the attached survey, which contains a legal description of the total 2.93 acres. The GA is plain and unambiguous and clearly brings the bluff property into the contract. Thus, we hold that the circuit court did not err in finding that a meeting of the minds occurred such that there was a contract and that the contract included the sale of the bluff property.

Resorting to parol evidence was not necessary here. Many witnesses provided testimony explaining why the GA and attached survey were created—to incorporate a legal description of both the house property and the bluff property—as well as why the REC, counter, and GA provide as they do. Such testimony is permitted because the parol-evidence rule does not prohibit the admission of extrinsic evidence to explain what terms mean or to acquaint the court with the circumstances surrounding the making of the contract. *Hurt-Hoover Invs., LLC*, 2014 Ark. 461, at 11, 448 S.W.3d at 703. Here, Certainly, there was no testimony that the contract was not to have included the bluff property. In fact, Smith Jr. testified that his father had not involved Smith Jr. in his personal, financial, or real estate matters since Smith Sr. had retired. Smith Jr. testified further that he did not know Smith

15

Sr. had previously listed the house property and the bluff property for sale; he did not know about the current real estate contract and counteroffer or that the seller was the Trust; and he did not know that Smith Sr. had already sold a piece of the bluff property. Best testified that Smith Sr., who was "sharp," specifically told her she was not to speak to Smith Jr. about the sale of the property. There was testimony explaining what the descriptors of the property being sold meant and how the various parcel IDs came into existence.[4] For example, Sandra Hiener, the Crawford County tax assessor, testified that the parcel ID number on the REC—700-08200-000—is a number for the "whole" that her office creates to split other parcels from—and that the 700-08200-000 number included *all* of Smith Sr.'s properties, which necessarily included the bluff property. Accordingly, we hold that the circuit court did not abuse its discretion in permitting the testimony it did, which, in totality, explained the terms of the contract and the circumstances that gave rise to it.

A contract exists that provides that in exchange for $291,000, the house property and the bluff property will be conveyed to appellees. The contract is in writing and contains all the essential terms, including a description of the land to be conveyed, and those terms are certain. Thus, with respect to appellants' argument that the statute of frauds was not satisfied,

---

[4]The record reflects that multiple parcel numbers were associated with property owned by Smith Sr.: parcel ID 700-08200-000, which Heiner testified her office created as the "main parcel" from which they would split off other parcels; parcel ID 700-08200-002, which consisted of 3.14 acres and was ultimately "cancelled" as a result of a May 2020 replat; parcel ID: 700-08200-101, consisting of approximately 1.98 acres and referred to as Parkview Tract 1—the two additional acres at issue here; and parcel ID 700-08200-102, consisting of approximately 1.07 acres and referred to as Parkview Tract 2. Smith Sr. sold Parkview Tract 2 in August 2020.

the only question remaining is whether it was signed by the party to be charged or by some other person properly authorized by the person sought to be charged.

Smith Sr.—the party to be charged—signed the counter he made on December 27, 2020, and there is no designation regarding what capacity, if any, Smith Sr. was executing the counter. Surveyor Ricky Hill testified that Smith Sr. went to Satterfield Land Surveyors on December 30, 2020, and ordered a survey and plat on "all of his remaining property." Best testified that Smith Jr. agreed to pick up the survey, which reflected that the house property and the bluff property consisted of 2.93 acres total, because Smith Sr. could no longer drive. Hill testified that Smith Jr. picked up the survey on February 2, 2021. Best testified that the GA was prepared with the legal description from the survey attached, and she contacted Smith Jr. and told him they could meet in person to go over the GA with the survey or he could e-sign it, whichever he preferred. Best explained that Smith Jr. told her he would e-sign it and directed Best to have the GA emailed to his email address: dubsmith3@gmail.com. Text messages exchanged between Best and Smith Jr. were entered into evidence and corroborate Best's testimony.

Smith Jr. testified that he picked up the survey at the surveyor's office, paid for it, and dropped it off at Waco Title, but that he did not look at it. Smith Jr. further testified that he does not remember if he signed the GA—he may have, he may not have—but if he did, it was while his father was still living. He testified that he was contacted on the 9th, but the GA says the 12th. He further testified that he did not sign a GA after his father died, which was on February 10, 2021.

The GA shows execution on February 12, 2021, at 7:00 p.m.:

17

The above General Addendum is executed on
(month) _____February_____ (day) ___12___, (year) ___2021___, at ___7:00___ ☐(a.m.) ☒(p.m.).

_____**Chuck Fawcett Realty, Inc.**_____
**Listing Firm**

Signature: _Chuck Fawcett_____    Signature: _____

Printed Name: _____**Chuck Fawcett**_____    Printed Name: _**SmithFamilyTrust Darrell Smith**_
       **Principal or Executive Broker**                         **Seller/Lessor**

Signature: _Tammy Best    Linda Black_    Signature: _Darrell Smith, Jr_____

Printed Name: ___**Tammy Best    Linda Black**___    Printed Name: _____**Darrell Smith, Junior**_____
       **Listing Agent**                              **Seller/Lessor**

Page 2 of 2

Serial#: 045382-300161-2913969
Prepared by: Linda Black | CHUCK FAWCETT REALTY INC | golfgirl77@cox.net |

Form 693
Simplicity

Chuck Fawcett testified that Chuck Fawcett Realty, Inc.—Smith Sr.'s real estate company—uses electronic-document-signing software, which was used to execute the GA. That software generates a "certificate of authenticity" that provides the date and time a document is sent, viewed, and signed as well as the name, email address, and IP address of any signatory.

The certificate of authenticity for the GA, which was admitted into evidence, reflects the following in relevant part:

# CONSTELLATION❶

## Certificate of Authenticity

### Session Information

| | | | |
|---|---|---|---|
| Signing Session ID: | ccc1dfd0-a9ea-483d-bc9f-6254a64af220 | Status: | Completed |
| Transaction Name: | Darrell Smith | Created On: | 2/9/2021 6:40:04 PM EST |
| Session Title: | 805 N 16th General Add Property Description | Last Modified: | 2/9/2021 7:35:18 PM EST |
| Documents: | 2 | Owner: | Linda Black |
| Signers: | 4 | Company: | CHUCK FAWCETT REALTY INC |

| | | | |
|---|---|---|---|
| Darrell Smith, Jr | _Darrell Smith, Jr_ | Sent: | 2/9/2021 7:16:06 PM EST |
| dubsmith3@gmail.com | | Viewed: | 2/9/2021 7:33:58 PM EST |
| Signer Security:  Email | IP Address: 107.77.201.81 | Disclosure: | 2/9/2021 7:33:58 PM EST |
| | ID: 77a56f4b-c039-467d-b879-8e154a62fda7 | Signed: | 2/9/2021 7:35:16 PM EST |

18

The certificate of authenticity shows that an email with an invitation to participate in an electronic signing session was sent to dubsmith3@gmail.com on February 9, 2021 at 7:16 p.m. The certificate of authenticity further shows that the IP address for the electronic device used by the signatory during the signing session was 107.77.201.81.

Fawcett explained that for the software to generate the certificate of authenticity and for Smith Jr. to be permitted to sign the GA, Smith Jr. would have necessarily viewed both the GA and its attachment—the survey portion containing the legal description that reflected approximately 3 total acres of real property. Fawcett further explained that the certificate reflected that Smith Jr. electronically signed the GA at 7:35:16 p.m. on February 9, 2012. Best and Fawcett both testified that the GA's execution date of February 12, 2021, at 7:00 p.m. is inaccurate because the form was dated incorrectly prior to it being sent for signing.

Appellees signed the third page of the GA—the survey portion—but Smith Jr. did not. Appellees' broker, James Vitale, testified that he had appellees sign that page because appellees were worried about making sure that everyone knew they had it. He further testified that when he received the GA from Black, it had been signed by Fawcett, Best, Black, and Smith Jr. Fawcett testified that they did not require a signature on the third page of the GA—the survey portion—because they do not normally have clients sign an attachment to a GA.

Jill Swad, customer service rep for BHC Insurance, testified that Smith Sr. had a homeowner's policy with them, and Smith Jr. contacted them around February 8 about canceling that policy effective February 23 since the house would be sold. She further testified that their records reflect that the request from Smith Jr. came from the email address

dubsmith3@gmail.com and the IP address 107.77.201.81. Smith Jr. confirmed during his testimony that his email address is dubsmith3@gmail.com, and he gets email on his phone. He testified that he recalled using DocuSign to sign the cancellation request on the homeowner's insurance. Smith Jr. further confirmed that he had POA over Smith Sr.'s real and personal property on February 9, 2021.

Smith Jr.—a person properly authorized by the person sought to be charged— electronically signed the GA prior to his father's death. It is well established in Arkansas that one is bound under the law to know of the contents of a paper signed by him, and he cannot excuse himself by saying he did not know what it contained. *Carmichael v. Nationwide Life Ins. Co.*, 305 Ark. 549, 552, 810 S.W.2d 39, 41 (1991). Smith Jr. had authority to sign the GA as his father's representative under the POA. The GA clearly references the attached survey; thus, it matters not that Smith Jr. did not sign the attached survey portion itself. The GA expressly provides that electronic signatures are permitted and binding upon all parties. Accordingly, we hold that the circuit court did not err in concluding that the contract complies with the statute of frauds.

As to consideration, appellees agreed to pay $291,000 for the house property and the bluff property, and as found by the circuit court, the evidence reflects that consideration was not lacking. Moreover, appellants' arguments are unsupported by convincing argument or authority, and we will not consider such unless it is apparent without further research that they are well taken. *See, e.g.*, *Tech. Partners, Inc. v. Regions Bank*, 97 Ark. App. 229, 234, 245 S.W.3d 687, 692 (2006). Appellants' arguments regarding impossibility of performance due to some issue with appellees' financing are also unpersuasive and is a misrepresentation

20

of the record. The testimony reflected that appellees always had financing available to them for the real-estate purchase. Moreover, the existence of a valid and enforceable contract does not depend on the terms of the agreements in place between appellees and their financial institutions.

Appellants' arguments regarding standing also fail. The circuit court found that under the POA, Smith Jr. could have conveyed the bluff property to the Trust, thus titling all the property in the Trust. As the successor trustee, Smith Jr. then could have conveyed the entirety of the property to appellees. The circuit court further found that it was apparent from Smith Jr.'s testimony that he never intended to complete the transaction on behalf of his father, citing Smith Jr.'s testimony that he thought his father had not gotten enough money for the property, that he would never have sold the property, not even for half a million dollars, and his belief that appellees, their realtor, and the Fawcett parties had conspired to cheat Smith Sr.

It is undisputed that the house property was owned by the Trust and the bluff property was owned by Smith Sr. During his testimony, Smith Jr. confirmed that he was the successor trustee of the Trust and authorized to act on the Trust's behalf if his father was not "able to continue to serve" as trustee. The POA admitted into evidence named Smith Jr. as Smith Sr.'s attorney-in-fact and specifically authorized Smith Jr. to execute contracts to sell real property owned by Smith Sr. and to execute deeds conveying Smith Sr.'s real property. Smith Jr. confirmed that during his testimony as well. The fact of Smith Sr.'s death and the subsequent opening of his Estate did not eviscerate valid contractual obligations entered into by Smith Sr. or his agents prior to his death. *See, e.g.*, *In re Spann's Est.*, 257

Ark. 857, 862–63, 520 S.W.2d 286, 290 (1975) ("Contractual obligations which survive the death of the obligor are binding on his executor in his representative capacity and enforceable against the estate, and it is the duty of the executor to carry out such contracts and compliance may be enforced unless the obligations are personal in nature and personal performance by the decedent is of the essence of the contract."). The deal could have closed. Thus, we hold that the circuit court did not err in denying each of appellants' directed-verdict motions or in ordering specific performance of the contract. Accordingly, we affirm the circuit court's February 18, 2022 oral rulings, the March 18, 2022 order and judgment, and the April 19, 2022 amended order and judgment.

## B. Attorney's Fees

Appellants next contend that the circuit court erred in awarding fees and costs to appellees because they are unavailable in an equitable claim, they were excessive, and there was an insufficient basis to impose them. The standard of review for an appeal of a fee award is whether there was an abuse of discretion. *James v. Walchli*, 2015 Ark. App. 562, at 7, 472 S.W.3d 504, 508. There is no fixed formula for determining what constitutes a reasonable amount of attorney fees. *Id*. at 7, 472 S.W.3d at 508. Because the circuit court has presided over the case and gained familiarity with the case and the extent and quality of the services rendered by the attorney, it has a superior opportunity to assess the critical factors that apply. *Id*.

First, attorney's fees are permissible in a specific-performance case. *See* Ark. Code Ann. § 16-22-308 (Repl. 1999); *Childs v. Adams*, 322 Ark. 424, 909 S.W.2d 641 (1995). Second, appellees were the prevailing parties. Third, appellees presented a well-supported

fee motion in a contentious case, and the circuit court granted an amount equal to 66 percent of what was requested. Appellants have failed to demonstrate that there was a clear abuse of discretion in the attorney-fee award. Accordingly, we affirm the May 16, 2022 order awarding attorney's fees and costs.

## C. Contempt

Appellants contend that the contempt finding must be reversed because the order and judgment were vague, and there was no showing of an ability to close or post a bond at the time of the order. They further contend that any accrued daily penalties should be remitted because appellees posted a supersedeas bond. A contempt proceeding is a cause of action to enforce valid orders of a court. *Mountain Pure, LLC v. Clear Water Holdings, LLC*, 2016 Ark. App. 542, at 7, 506 S.W.3d 281, 286. Contempt is a matter between the judge and the litigant and not between the two opposing litigants. *Id.* To establish contempt, there must be willful disobedience of a valid order of a court. *Id.* For a person to be held in contempt for violating a court order, that order must be clear and definite as to the duties imposed upon the party, and the directions must be expressed rather than implied. *Id.*

The order and judgment clearly directed the parties to close the real-estate deal—the sale of a house and approximately three acres in exchange for $291,000. At the time of the order, the Estate existed complete with an executor, and Smith Jr. was the successor trustee for the Trust. Appellants intentionally and willfully defied a clear and unequivocal court order. Accordingly, we affirm the May 27, 2022 order of contempt.

As to the daily penalties, that order was also clear—the penalties would cease accruing upon the satisfaction of one of two things: either the closing of the real estate deal or the

23

posting of the supersedeas bond. Appellants chose the latter. Under the clear language of the contempt order, the daily penalties ceased accruing at that point. As to any argument that the entirety of the fees accrued up until the posting of the bond should be forgiven, it is unavailing. As the circuit court appropriately and understandably stated, "zero" was not going to do it, given appellants' contemptuous conduct. Accordingly, we hold that the daily penalties that accrued up to and including the date that appellants posted their bond were valid.

## IV. *Cross-Appeal*

On cross-appeal, appellees contend that the circuit court erred by not awarding them an equitable credit of $24,000 for the deprivation of the use of the property. Appellees planned to have a double closing on February 22, 2021, selling their home and buying the property at issue. Appellees closed on the sale of their home, but because they were unable to close on the at-issue property, they moved into a rent house and stored some personal belongings. The Smith house was damaged by a tornado in May 2021, and testimony was given that it would cost $17,829.61 and $5100 to repair those damages—costs that would have been covered by the homeowner's insurance had it not been canceled by Smith Jr., effective February 23, 2021.

The circuit court ordered the contract performed—the house property and the bluff property in exchange for $291,000—less equitable credits in favor of appellees for $22,929.61 in repairs to the house; $1416 in storage fees; $12,000 in rent; and $2400 in moving expenses. The circuit court declined to also award appellees an equitable credit for

the rental value of the Smith house as representative of appellees' deprivation of the house during the litigation.

The circuit court's decisions regarding equitable credits were conclusions of law. Accordingly, the standard of review is de novo. *Barnes v. Wagoner*, 2019 Ark. App. 174, at 3, 573 S.W.3d 594, 596. Specific performance is an equitable remedy that compels the performance of a contract on the precise terms agreed on or such a substantial performance as will do justice between the parties under the circumstances. *McCoy Farms, Inc. v. J&M McKee*, 263 Ark. 20, 32–33, 563 S.W.2d 409, 415–16 (1978). The object in such cases is to place the party without fault in nearly the same position as he would have been had there been no default by the other party. *Id.* The guiding principle in such cases is to relate the contract back to the date set therein. *Id.* Although, strictly speaking, legal damages are not awarded when specific performance is decreed, a decree should, as nearly as possible, give the complainant credit for any losses occasioned by the delay. *Id.*

There is no indication in the record that appellees were ever going to do anything but reside in the Smith house themselves. Because they were unable to due to appellants' breach of contract, appellees were forced to rent a place to live and store personal belongings. The circuit court awarded appellees equitable credits representative of those costs. The circuit court further ordered that appellees be credited for costs that will be necessary to make repairs to the house. On this record, we cannot say that the circuit court erred in denying appellee's request.

Affirmed on direct appeal; affirmed on cross-appeal.

ABRAMSON and WOOD, JJ., agree.

25

*Phillip J. Milligan* and *Robert S. Tschiemer*, for appellants/cross-appellees.

*Jones, Jackson, Moll, McGinnis & Stocks, PLC*, by: *Mark Moll*, for appellees/cross-appellants.